UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| VALDEZ N. MAXWELL, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 3:09-CV-008-PPS |
| SOUTH BEND WORK RELEASE CENTER, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

This is an ADA and Rehabilitation Act case wherein the Plaintiff Valdez Maxwell claims to have been discriminated against by defendant Imperial Stamping Corporation. Imperial now seeks summary judgment [DE 143]. For the reasons discussed below, Imperial's motion for summary judgment is **GRANTED**.

## BACKGROUND

Imperial is a privately-owned Indiana corporation that operates a 40-employee metal products production facility in Elkhart, Indiana. Approximately half of its employees are work-release inmates, either from the Elkhart County Work Release Center or from defendant South Bend Work Release Center ("SBWRC"). Imperial's inmate-employees, like its non-inmate employees, work on an at-will basis.

In May 2007, Maxwell was a prisoner in the custody of Indiana Department of Corrections and a resident of SBWRC. On May 14, Maxwell arrived at Imperial, along with other SBWRC inmates for a work assignment [DE 132, ¶¶ 10-11]. Maxwell, who is disabled, alleges that Imperial unlawfully refused to hire him because of his disability [*Id*., ¶ 17]. In his second amended complaint against Imperial, SBWRC and other defendants, Maxwell asserts

claims against Imperial under (i) Title II of the Americans with Disabilities Act of 1990 ("ADA") [DE 132, ¶ 26]; (ii) Section 504 of the Rehabilitation Act of 1973 [*Id.*, ¶ 27]; and (iii) Section 1983, based on the allegation that Imperial violated Maxwell's rights under the Eighth and Fourteenth Amendments, by subjecting him to cruel and unusual punishment [*Id.*, ¶ 28].

Maxwell's original complaint sought relief under Title I of the ADA, rather than Title II. But the Court granted Maxwell's motion to file a second amended complaint [DE 127], which, among other things, substituted Maxwell's original Title I claim for the current Title II claim [DE 132]. In support of his motion for leave to file a second amended complaint [DE 117], Maxwell stated that he had erroneously assumed that his ADA claim was properly brought under Title I, when in fact it should have been brought under Title II [DE 118].

Imperial argues that each of these claims fails. Specifically, Imperial argues that Maxwell's ADA Title II claim is legally deficient because (1) Imperial is not a "public entity" and is thus not subject to liability under Title II; and (2) employment discrimination claims cannot be brought under Title II of the ADA. Imperial argues that Maxwell's Rehabilitation Act claim fails because Imperial does not receive federal financial assistance. As for Maxwell's Section 1983 claim, Imperial argues that, as a private employer, it is not subject to Section 1983 claims.

Maxwell's response addresses Imperial's arguments as to the Title II and Rehabilitation Act claims. But Maxwell presents no response to Imperial's request for summary judgment as to the Section 1983 claim. So summary judgment will be granted as to the § 1983 claim without further discussion. *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (claims not addressed in a summary judgment opposition brief are abandoned).

## DISCUSSION

**I.     Maxwell's Claim Under Title II**

**A.     Imperial Is Not a Public Entity.**

Title II of the ADA prohibits disability discrimination only in the services of a "public entity." 42 U.S.C. § 12131. Only public entities are liable for violations of Title II of the ADA. *Id.*; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210. Imperial argues that it is not a "public entity" within the meaning of Title II of the ADA and is thus not subject to liability under Title II. I agree. Title II defines a "public entity" as follows:

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

42 U.S.C. § 12131(1).

Maxwell does not dispute that Imperial is a private for-profit corporation that employs prisoners from defendant SBWRC, which is a unit of IDOC [DE 137 at 3]. Rather, Maxwell asserts that Imperial's "business relationship" with IDOC makes it an "instrumentality of IDOC," and thus a state agency within the meaning of Title II [DE 155 at 3-4]. Of course the above "public entity" definition does not list private employers that have business or contractual relationships with public entities. So Maxwell must rely on his argument that Imperial's business relationship with IDOC renders it an "instrumentality of a State" for Title II purposes.

Even viewing the evidence in the light most favorable to Maxwell—*i.e.*, assuming that Imperial contracts with IDOC and/or SBWRC for the provision of services—this argument

provides no basis for extending Title II liability to Imperial.[1] To begin with, Maxwell does not cite any authority for the proposition that a private entity becomes an "instrumentality of the State" merely by contracting with a public entity for the provision of some service. Indeed, the cases that I have found suggest the contrary. At least two circuit courts of appeal have rejected it. *See Edison v. Douberly,* 604 F.3d 1307, 1308-10 (11th Cir. 2010) ("a private corporation is not a public entity merely because it contracts with a public entity to provide some service"); *Green v. New York,* 465 F.3d 65, 78-79 (2d Cir. 2006) (private hospital performing services pursuant to a contract with a municipality is not an instrumentality of a local government).

The *Edison* case is instructive here in part because the defendant private prison management corporation in that case was under contract with a state prison. Imperial denies being under contract with SBWRC, IDOC or any other governmental entity [DE 144-1, ¶ 6]. But under *Green* and *Edison*, even if Imperial did contract with IDOC or some other public entity, that would not provide a basis for subjecting it to liability under Title II. This is because "the term 'instrumentality of a State' refers to governmental units or units created by them." *Edison* at 1310; *see also Green,* 465 F.3d at 78-79. In other words, "[a] private contractor does not, . . . become liable under Title II merely by contracting with the State to provide governmental services, essential or otherwise." *Edison*, 604 F.3d at 1310.

Several district courts have arrived at the same conclusion, including in cases where the defendant is a private entity that contracts to provide services to a prison. *See Medina v. Valdez,* No. 1:08-CV-00456, 2011 WL 887553, at *3 (D. Idaho Mar. 10, 2011) (private entity under contract with prison could not be considered a "public entity" under the statute because it was

---

[1] Maxwell asks me to take judicial notice of certain information on IDOC's website that suggests that IDOC partners with private entities to place inmates in jobs [DE 154]. That evidence has no bearing on the decision I am making, so that motion is denied as moot.

not a governmental entity); *Castle v. Eurofresh, Inc.*, 734 F. Supp. 2d 938, 943 (D. Ariz. 2010) (same); *Cox v. Jackson*, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008) (same); *Wynott v. Correctional Med. Servs., Inc.*, No. 08-61-P-S, 2008 WL 2061385, at *2 (D. Me. May 13, 2008) (same); *see also Hahn v. Linn County*, 191 F. Supp. 2d 1051, 1055 n.2 (N.D. Iowa 2002) (contractual relationship between a private corporation and a county government does not transform the private corporation into a "public entity"); *O'Connor v. Metro Ride, Inc.,* 87 F. Supp. 2d 894, 900 (D. Minn. 2000) (granting summary judgment to private, for-profit company that provided contract services to regional transportation board because company was not a public entity under Title II of the ADA).

I agree with the conclusion in *Edison* and *Green* that a private company does not become a public entity for Title II purposes merely because it has a business or contractual relationship with a public entity. Because Imperial is such a private company, and without having located (or been directed to) any cases to the contrary, I conclude that Imperial is not a "public entity" under § 12131, and is therefore not subject to suit under Title II. Accordingly, Imperial is entitled to summary judgment with respect to Maxwell's claim under Title II of the ADA.[2]

### B. Title II of the ADA Does Not Apply to Employment.

Imperial's other ground for summary judgment on Maxwell's Title II claim poses the interesting question of whether Title II of the ADA even applies to employment. The circuit courts of appeal are split on the issue, and the Seventh Circuit, while recognizing the split in

---

[2] Maxwell moved to strike [DE 153] Conner's testimony that Imperial "is not a part of the federal government, a state, a political subdivision of a state, or in any way an instrumentality of a state." I have not relied on Conner's affidavit in arriving at my decision, so that motion is denied as moot.

authority, has not had the occasion to decide the issue. (The district courts in this circuit are likewise split on the issue).

Title I of the ADA specifically applies to employment but it requires that plaintiffs exhaust their remedies through the EEOC before coming to court. Long before Maxwell sought leave to replace his Title I claim with a Title II claim, this Court observed that Maxwell had not sufficiently shown that he had exhausted his EEOC remedies before pursuing his Title I claim in federal court, and gave him leave to amend to correct for that deficiency [DE 69]. If Maxwell did not exhaust his remedies, and sought leave to proceed under Title II to circumvent Title I's exhaustion requirement, then he is out of luck unless it is found that Title II also applies to employment.

For the reasons stated below, I find that the plain language of the statute makes it clear that Title II does not cover employment.[3] Accordingly, this provides an alternative ground upon which Imperial is entitled to summary judgment on Maxwell's Title II claim.

### 1. Statutory Overview

The ADA contains five titles: Employment (Title I), Public Services (Title II), Public Accommodations and Services Operated by Private Entities (Title III), Telecommunications (Title IV), and Miscellaneous Provisions (Title V). Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327 (1990). Maxwell seeks relief under Title II of the ADA – the section entitled "Public Services" [DE 132, ¶ 26].

---

[3]The following analysis and conclusion closely tracks my earlier opinion in *Canfield v. Isaacs*, 523 F. Supp. 2d 885 (N.D. Ind. 2007).

As part of the ADA, Congress required the Attorney General to promulgate regulations implementing Title II. 42 U.S.C. § 12134(a). Pursuant to that authority, the Attorney General determined that Title II applies to employment:

> No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.

28 C.F.R. § 35.140(a).

In deciding what to make of this regulation, courts get guidance from *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984). Under *Chevron*, I must first determine whether Congress has unambiguously expressed its intent on the issue at bar: "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9. If, however, Congress has not spoken in unambiguous terms, then courts must defer to the administrative regulation interpreting the statute unless the agency's interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. This has come to be known as "*Chevron* deference." *See, e.g., U.S. v. Genendo Pharmaceutical, N.V.*, 485 F.3d 958, 962 (7th Cir. 2007).

As noted above, there is a split of authority on the issue of whether Title II applies to public employment. The Ninth Circuit has concluded that Congress unambiguously intended that Title II not apply to public employment. *Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir. 1999); *cf. Parker v. Metro. Life Ins. Co*., 121 F.3d 1006, 1014-15 (6th Cir. 1997) (holding that Title I exclusively addresses employment discrimination under the ADA, and therefore such a claim may not be brought under Title III (Public Accommodation)). The Eleventh Circuit, however, has concluded that Congress left a gap for agency interpretation, and

7

has upheld the interpretation of the Attorney General. *Bledsoe v. Palm Beach County Soil and Water Conservation Dist.*, 133 F.3d 816, 822-23 (11th Cir. 1998). The Seventh Circuit has recognized the split in authority but has not addressed the issue. *Staats v. County of Sawyer*, 220 F.3d 511, 518 (7th Cir. 2000).[4]

The Supreme Court has also taken note of the circuit split but has not resolved it. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 n.1 (2001). In *Garrett*, the Supreme Court, albeit in *dicta*, tipped its hand a bit as to where it stood on the issue. *Garrett* involved the question of whether the Eleventh Amendment prohibited state employees from collecting damages against the state under Title I of the ADA. Title II was referenced by the parties but neither side specifically briefed the issue of "[w]hether Title II of the ADA, dealing with the 'services, programs, or activities of a public entity,' 42 U.S.C. § 12132, is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject." *Id.* In addressing this issue, then Chief Justice Rehnquist stated that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)) (quotation marks omitted). While this *dicta* is of course not binding, it gives some indication as to where the Supreme Court, as it was constituted in year 2001, stood on the issue.

---

[4] The district courts in this Circuit are also split on this issue. *Compare Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 657 (N.D. Ind. 2006) (holding that Title II does not cover claims of employment discrimination against a public employer); *Canfield v. Isaacs*, 523 F.Supp.2d 885 (N.D. Ind. 2007) *and Patterson v. Illinois Dep't of Corr.*, 35 F. Supp. 2d 1103, 1109-10 (C.D. Ill. 1999) (same) *with Petersen v. Univ. of Wis. Bd. of Regents*, 818 F. Supp. 1276, 1278 (W.D. Wis. 1993) (concluding that Title II is ambiguous, and deferring to Department of Justice regulation applying Title II to employment) *and Doe v. County of Milwaukee*, 871 F. Supp. 1072, 1074-75 (E.D. Wis. 1995) (relying on 28 C.F.R. § 35.140 to find that Title II applies to employment).

## 2. Statutory Interpretation

A court must use "traditional tools of statutory construction" to determine whether Congress has spoken unambiguously to the question at issue in the case. *Chevron*, 467 U.S. at 843 n. 9. The operative provision of Title II states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Thus, there are two key clauses in § 12132: (1) "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity"; and (2) "be subjected to discrimination by any such entity." Title II only encompasses employment discrimination, then, if employment is considered a "service, program, or activity" of a public entity, or if the more general anti-discrimination clause can be read independently of the first clause such that it forbids discrimination by a public entity in any context, not just in the provision of services, programs, and activities.

As to the first issue, I conclude that "employment" is plainly not a "service, program, or activity" of a public entity. Defining the terms "services," "programs," or "activities" to include employment strains the ordinary meanings of those words. *See Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."). I agree with the Ninth Circuit and several other courts that have concluded that "services, programs, or activities" refers to a public entity's "outputs," whereas employment is best understood as an "input." The Ninth Circuit made this point persuasively with the following illustration:

> Consider, for example, how a Parks Department would answer the question, "What are the services, programs, and activities of the Parks Department?" It might answer, "We operate a swimming pool; we lead nature walks; we maintain playgrounds." It would not

> answer, "We buy lawnmowers and hire people to operate them." The latter is a means to deliver the services, programs, and activities of the hypothetical Parks Department, but it is not itself a service, program, or activity of the Parks Department.

*Zimmerman*, 170 F.3d at 1174 (citing *Decker v. Univ. of Houston*, 970 F. Supp. 575, 578 (S.D. Tex. 1997)); *see also Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 655-56 (N.D. Ind. 2006), and the cases cited therein.

That brings us to the second clause of Title II, the clause that states "or be subjected to discrimination by any such entity." Many of the courts that have held that Title II applies to employment have relied on this more general clause to get to that result. However, the remainder of Title II unambiguously demonstrates that Congress intended Title II to be confined to the context of public services. Like § 12132, the definition of a "qualified individual with a disability" in Title II limits the scope of the Title to people who receive the services of, or participate in the programs or activities of, a public entity:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity*.

42 U.S.C. § 12131(2) (emphasis added). This definition demonstrates that Congress did not intend the discrimination clause to stand alone. As one court stated, "Because a plaintiff must be an individual who 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity,' the second clause of § 12132, prohibiting 'discrimination by any such entity,' necessarily relates back to the 'services, programs, or activities' set forth in the first clause." *Brettler*, 408 F. Supp. 2d at 657 (emphasis omitted).

The language and structure of the ADA as a whole supports this interpretation and demonstrates that Congress unambiguously intended for Title II not to cover employment. *See Russello*, 464 U.S. at 23 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation marks and citation omitted). First, and most obviously, "Congress placed employment-specific provisions in Title I, which it labeled 'Employment,' whereas Congress placed no employment-related provisions in Title II, which it labeled 'Public Services.'" *Zimmerman*, 170 F.3d at 1176.

Second, Congress defined "qualified individual with a disability" differently in Title I than in Title II. In Title I, the term means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, in Title I, "a person is 'qualified' if the person can work, whereas in Title II a person is 'qualified' if the person is eligible to receive services or participate in a publicly provided program." *Zimmerman*, 170 F.3d at 1176.

Third, reading Title II to encompass employment claims would make Title I almost completely redundant with respect to public employees, and would result in eliminating Title I's exhaustion requirement. *Id.* at 1177-78. Of course, this interpretation may be precisely why Maxwell is pursuing his claim under Title II, but it violates the interpretive canon presuming that no statutory provision is mere surplusage. *Commodity Trend Serv., Inc. v. Commodity Futures Trading Com'n*, 233 F.3d 981, 989 (7th Cir. 2000). Given that Congress specifically included the employment practices of state and local governments in Title I, it is unlikely that it intended to strain the language of Title II to cover the same ground.

Finally, Congress gave regulatory authority over Title I to the EEOC, the agency that administers most federal employment-related statutes, but gave the Attorney General the authority to interpret Title II. *Zimmerman*, 170 F.3d at 1178. If Title II were construed to include employment discrimination, it would subject public employees to conflicting regulations. Congress recognized the potential for conflict between regulation under Title I, for which the EEOC has enforcement responsibility, and the Rehabilitation Act of 1973, for which the Attorney General has enforcement responsibility, and specifically required coordination between the two. *See* 42 U.S.C. § 12117(b). The fact that Congress did not include a provision requiring coordination between the two agencies with respect to employment suggests that it did not intend for the Attorney General to have any ability to regulate employment under Title II.

In sum, the language of Title II and the structure of the ADA as a whole lead to the conclusion that Congress unambiguously did not intend for Title II to reach employment discrimination – that's what Title I was for. I acknowledge that other courts have reached the contrary conclusion. In *Bledsoe*, the Eleventh Circuit looked to legislative history tying Title II to Section 504 of the Rehabilitation Act, which does extend to employment. 133 F.3d at 821. In so doing, *Bledsoe* gave weight to the DOJ regulations that expressly apply Title II to employment discrimination claims. 133 F.3d at 822.

The question is a close one. But under *Chevron*, once a court finds that the language of a statute is unambiguous, review of legislative history or other outside materials is inappropriate, as is deference to the agency's interpretation of the statute:

> [N]ormally neither the legislative history nor the reasonableness of the [agency's interpretation] would be determinative if the plain language of the statute unambiguously indicated that Congress sought to foreclose the [agency's] interpretation. . . .[I]f the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis.

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007) (citing *Chevron*, 467 U.S. at 842-43). In this case, I believe that the plain language of the statute forbids me to resort to legislative history or to defer to DOJ regulations, and therefore, I am not persuaded by *Bledsoe*.

\* \* \*

To summarize: Maxwell's Title II claim fails because Imperial is not a public entity. His claim also fails because Title II does not apply to employment.

## II.     Maxwell's Rehabilitation Act Claim

Imperial argues that Maxwell's Rehabilitation Act claim fails because Imperial is a private employer, and not a program or activity receiving federal assistance. I agree.

To prevail on his claim under the Rehabilitation Act, Maxwell must prove four elements: "(1) that [he] is a 'handicapped individual' under the Act, (2) that [he] is 'otherwise qualified' for the [benefit] sought, (3) that [he] was [discriminated against] solely by reason of [his] handicap, and (4) that the program or activity in question receives federal financial assistance." *Grzan v. Charter Hosp. of N.W. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997); *see also* 29 U.S.C. § 794(a).

Thus, to prove a violation of the Rehabilitation Act by Imperial, Maxwell must show that Imperial receives federal financial assistance. *See Jackson v. City of Chicago,* 414 F.3d 806, 811 n.2 (7th Cir. 2005); *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999). Conversely, if Maxwell cannot show that Imperial is a recipient of federal funds, his Rehabilitation Act claim fails. *Grzan*, 104 F.3d at 119.

Imperial presents undisputed evidence in the form of an affidavit from Jon Conner, its general manager [DE 144-1], that it does not receive federal financial assistance. Conner avers that Imperial "does not receive any compensation from the federal government" and "does not

have a contract with the federal government" [DE 144-1, ¶¶ 5-6]. Maxwell does not contest this. Moreover, he does not allege in his complaint that Imperial is a recipient of federal funds. Nor does he assert this in his response. And, although Maxwell has moved to strike certain portions of Conner's affidavit, he does not take issue with the above-quoted portion [DE 153].

Here's what Maxwell does assert in response to Imperial's challenge to his Rehabilitation Act claim: that IDOC is an agency of the state of Indiana [DE 155 at 7]; that IDOC and Imperial are participants in a joint venture [*Id*. at 4]; that Imperial is thus an instrumentality of IDOC [*Id*. at 5]; and that IDOC receives federal financial assistance [*Id*. at 7]. None of this, however, can save his Rehabilitation Act claim, which requires that Imperial be a *direct* recipient—not merely an indirect beneficiary—of federal financial aid for it to be subject to Rehabilitation Act liability.[5]

In *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986), the Supreme Court addressed the issue of "who could and who could not be held liable as [a] recipient of federal funds under Section 504." *Grzan*, 104 F.3d at 119-20. In *Paralyzed Veterans*, the Supreme Court explained that "Congress limited coverage under the Rehabilitation Act to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept federal funds." *Grzan*, 104 F.3d at 120 (quoting *Paralyzed Veterans*, 477 U.S. at 605). Thus, liability under the Rehabilitation Act ends with the entity that directly receives the federal funds because "coverage

---

[5] As mentioned above in footnote 1, Maxwell requests [DE 154] that the Court take judicial notice of certain information on IDOC's website relating to IDOC's partnerships with private entities, such as Imperial. Maxwell appears to intend such information to bolster his claim that Imperial benefits from the federal financial assistance that IDOC receives. But, as noted above, IDOC's receipt of federal financial assistance cannot save Maxwell's Rehabilitation Act claim, so the motion is again denied as moot.

of the Rehabilitation Act does not follow federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." *Id.*; *see also Echemendia v. Gene B. Glick Management Corp.*, No. 1:15-CV-53, 2007 WL 869196, at *12 (N.D. Ind. Mar. 20, 2007).

Accordingly, Imperial cannot be liable under the Rehabilitation Act, even if, as Maxwell asserts, it participates in a joint venture with IDOC, because it does not actually receive federal financial assistance. So Imperial is entitled to summary judgment on Maxwell's Rehabilitation Act claim on that basis.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant Imperial Stamping Corp.'s motion for summary judgment [DE 143]. Because this ruling disposes of all of plaintiff Valdez Maxwell's claims against Imperial, Imperial is **DISMISSED** from this lawsuit. Moreover, the following motions are **DENIED AS MOOT**: Maxwell's motion to take judicial notice [DE 154]; Maxwell's motion to strike [DE 153]; and Imperial's motion to strike [DE 165]. Maxwell's claims against the remaining defendants in this case remain pending.

**SO ORDERED**.

ENTERED: April 13, 2011 /s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT